# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

HANI ATALLAH and SHIVA STEIN, )
Derivatively on Behalf of QURATE )
RETAIL, INC., )
                                        )
               Plaintiffs, )
                                        )
      v. )
                                        )
JOHN C. MALONE, GREGORY B. )
MAFFEI, RICHARD N. BARTON, )
FIONA P. DIAS, M. IAN G. ) C.A. No. 2021-1116-SG
GILCHRIST, LARRY E. ROMRELL, )
MARK VADON, DAVID E. RAPLEY, )
and ANDREA L. WONG, )
                                        )
               Defendants, )
                                        )
        -and- )
                                        )
QURATE RETAIL, INC., a Delaware )
Corporation, )
                                        )
               Nominal Defendant. )

## MEMORANDUM OPINION

Date Submitted: April 21, 2023
Date Decided: July 19, 2023

F. Troupe Mickler IV and Stephen E. Jenkins, ASHBY & GEDDES, P.A., Wilmington, Delaware; OF COUNSEL: William J. Fields, Christopher J. Kupka, and Samir Shukurov, FIELDS KUPKA & SHUKUROV LLP, New York, NY; Gustavo F. Bruckner, Samuel J. Adams, and Daryoush Behbood, POMERANTZ LLP, New York, NY; Brian Schall, THE SCHALL LAW FIRM, Los Angeles, CA; *Attorneys for Plaintiffs Hani Atallah and Shiva Stein*.

Kevin R. Shannon, Tyler J. Leavengood, Jaclyn C. Levy, Michael C. Gorski, Jr., and Lucille E. Wiesner, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Richard B. Harper, Vern Cassin, Thomas E. O'Brien, Alyssa M. Pronley, and Kristina Wenner, BAKER BOTTS LLP, New York, NY, *Attorneys for Defendants Richard N. Barton, Fiona P. Dias, M. Ian G. Gilchrist, Larry E. Romrell, Mark Vadon, David E. Rapley, and Andrea L. Wong*.

Bradley R. Aronstam, S. Reiko Rogozen, and Roger S. Stronach, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendant Gregory B. Maffei*.

Joseph O. Larkin, Matthew P. Majarian, and Rupal K. Joshi, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: James R. Carroll, SKADDEN, ARPS, MEAGHER & FLOM LLP, Boston, MA; *Attorneys for Defendant John C. Malone*.

**GLASSCOCK, Vice Chancellor**

This case involves a scenario in the shaded portion of the otherwise sunny uplands of equity. Here, a team of two stockholders holds control, it is alleged, of a Delaware corporation, Qurate Retail, Inc. ("Qurate" or the "Company"). These controllers are also members of the board of Qurate. One, John C. Malone, has certain contractual rights against, and obligations to, the Company, which provide the Company with a call right on his high vote stock in Qurate, upon the happening of certain conditions. The other putative controller, Gregory B. Maffei, also had an employment contract with the company. That contract provided for significant benefits upon a change in control, which exercise of the Malone call right would trigger.

Plaintiffs' derivative complaint (the "Complaint") alleges that Maffei made a sham offer to purchase Malone's high vote stock, which appeared to trigger the call right. Malone and Maffei (through exercise of their fiduciary and voting control of Qurate) encouraged the Company's board to exercise this contractual call right, which in turn forced the Company to renegotiate Maffei's employment contract to avoid the change-in-control benefits from accruing, much to Maffei's benefit. The Plaintiffs seek damages against Defendants Maffei and Malone, and against other Defendant directors, in connection with this complex series of transactions.

1

Before me are Defendants' motions to dismiss.  Because I find that a majority of the board lacks independence from Malone and Maffei, Rule 23.1 is satisfied and the matter may proceed derivatively, so long as the pleading requirements of Rule 12(b)(6) are met.  Thus, the allusion to the umbra of equity; Malone argues that this matter is, in essence, only his exercise of a contract right,[1] and does not implicate equity, at all.

On examination, the shade proves not so deep.  What is alleged is that two fiduciaries colluded to propose a sham transaction, through which Company wealth was wrongfully transferred to Maffei.  Despite the fact that the scheme alleged depended on a contract right, the actions of the fiduciaries, *in that capacity*, are alleged to have been harmful to the Company, and to have caused the Company to enter into a series of transactions which provided a non-ratable benefit to Malone and Maffei, beyond any contract rights held by Malone, triggering entire fairness review.  With respect to the other Director Defendants, however, I find that the Complaint fails to state a claim cognizable under our Supreme Court's directives in *Cornerstone*,[2] and that those directors must be dismissed.

---

[1] In actuality, the call right was a right belonging to Qurate, to which Malone was subject.  The Defendants argue that the transactions at issue were purely helpful to Qurate, in that they lessened voting control by Malone and Maffei.  Perhaps, and the allegations of the complaint remain only allegations.  It is precisely to sort out the fairness of controlled transactions that our Court employs entire fairness, and it is a rare entire fairness case that may be dismissed under 12(b)(6).

[2] *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173 (Del. 2015).

The facts of these transactions, barely limned above, are explained in detail below, followed by my analysis of the motions to dismiss.

## I. BACKGROUND[3]

Nominal Defendant Qurate is a Delaware incorporated media conglomerate with its principal place of business in Englewood, Colorado.[4] Defendant John Malone has been a director of Qurate (or its predecessors) since the spin off from Tele-Communications Incorporated ("TCI") in 1991.[5] Malone also served as the chairman of Qurate's board from 1994 to 2018 and as its CEO from August 2005 to February 2006.[6] Defendant Gregory B. Maffei has been a Qurate director since 2005 and succeeded Malone as chairman in March 2018.[7] When the Complaint was filed, the remaining members of the 10-member Qurate board (the "Board") were Richard N. Barton,[8] Fiona P. Dias,[9] Michael A. George,[10] M. Ian G. Gilchrist,[11] Evan D.

---

[3] Except where otherwise noted, the facts in this section are drawn from the Verified S'holder Derivative Compl. for Breach of Fiduciary Duties (the "Compl."), Dkt. No. 1, and the documents it incorporates by reference.
[4] Compl. ¶ 22.
[5] *Id.* ¶¶ 23, 34.
[6] *Id.* ¶ 23.
[7] *Id.* ¶ 24.
[8] *Id.* ¶ 25.
[9] *Id.* ¶ 26.
[10] *Id.* ¶ 27. George was also President and CEO of the Company from March 2018 through September 2021. *Id.* He transitioned to the role of Senior Advisor in October 2021 and was expected to resign from the Board effective January 1, 2022. *Id.*
[11] *Id.* ¶ 28.

Malone ("Evan"),[12] Larry E. Romrell,[13] Mark Vadon,[14] and Andrea L. Wong.[15] All members of the Board are named as Defendants in this action.[16]

*A. The Origin of the Call Right*

On February 9, 1998, Malone and TCI entered into an agreement giving TCI the conditional right to purchase high vote Series B common stock ("High Vote Stock") from Malone or his affiliates (the "Call Agreement").[17] The Call Agreement provides, in part, that:

> [U]pon Malone's death, the Company shall have the right (the "Call Right"), exercisable by action of the Independent Committee, to purchase all but not less than all of the shares of High Vote Stock beneficially owned by each Member at the time of Malone's death and all but not less than all of the shares of High Vote Stock that are then beneficially owned by any Permitted Transferee of any Member and which shares were acquired directly or indirectly from a Member or another Permitted Transferee of Member Shares in any Exempt Transfer or other transaction except a sale to a prospective Purchaser in accordance with Section 2.3(b) hereof (collectively for all Members and Permitted Transferees, the "Subject Shares").[18]

---

[12] *Id.* ¶ 29.  This Memorandum Opinion uses Evan's first name for the sake of distinguishing him from his father, John C. Malone, and intends no disrespect.

[13] *Id.* ¶ 30.

[14] *Id.* ¶ 31.

[15] *Id.* ¶ 32.

[16] *See id.* ¶¶ 23-32.  The Board, that is, at the time the Complaint was filed.

[17] *Id.* ¶ 49.

[18] Ex. 1 to Def. John C. Malone's Opening Br. in Supp. of his Mot. to Dismiss the Verified S'Holder Derivative Compl. (the "Call Agreement") § 2.2, Dkt. No. 17.

4

In addition to Malone's death, the Call Agreement provides that the Call Right can also be triggered by an offer to purchase Malone's High Vote Stock from an outside investor (the "Acceleration Provision").[19] Specifically:

> If any Member or any Permitted Transferee (as applicable, the "Transferor") receives a bona fide written offer (a "Bona Fide Offer") from a Person who is not an Affiliate of any Member or any Permitted Transferor (a "Prospective Purchaser") to purchase all or any of the Member Shares beneficially owned by the Transferor and the Transferor desires to accept the Bona Fide Offer, then prior to the acceptance of the Bona Fide Offer by the Transferor, the Call Right shall accelerate as to the Member Shares that are the subject of the Bona Fide Offer (the "Offered Shares") and the Company may exercise the Call Right[.][20]

Finally, the Call Agreement includes covenants that limited Malone and his affiliates to a maximum premium of 10% in the event of a sale of the company (the "Additional Covenants").[21]

In short, the Call Agreement, once triggered, gave TCI a short-lived option to buy out Malone's control stake in the event of his death or a bona fide offer from an unaffiliated party.[22] In exchange, Malone received $100 million for the grant of the Call Right, $25 million for the Acceleration Provision, and $25 million for the

---

[19] Call Agreement § 2.3(b)(i).
[20] *Id.*; Compl. ¶ 50.
[21] Compl. ¶ 51; Call Agreement § 6.1.
[22] *See* Call Agreement § 2.3(b)(v) (giving the Company only 10 days to elect to exercise the Call Right following a Bona Fide Offer).

5

Additional Covenants.[23]  The rights under the Call Agreement eventually came to rest, unmodified,[24] with the Company as TCI's successor-in-interest.[25]

### B. Maffei's Offer

On May 18, 2021, Maffei delivered to Malone an offer (the "Offer") to acquire all of the High Vote Stock beneficially owned by the Malone Group at a price of $14 per share.[26]  That same day, Malone provided the Company with written notice of his desire to accept the Offer, subject to Board approval.[27]  Assuming the Offer met the appropriate criteria, the Call Agreement then provided the Company with the right to purchase the shares at the lower of (a) the Offer price of $14 per share or (b) 110% of the average closing price of the Company's common stock for the preceding 30 days, equal to $13.62.[28]

Two days later, the Board, including Malone and Maffei, met to discuss the Offer.[29]  At that meeting, Malone expressed a preference to settle the Call Right in

---

[23] Compl. ¶ 52.
[24] *Id.* ¶ 54.
[25] *Id.* ¶ 5, 53.
[26] *Id.* ¶ 54.  Malone Group is defined in the Call Agreement as "(i) each of Malone and Leslie, (ii) each other Person who is required to become or becomes a party to this Agreement and a member of the Malone Group pursuant to any provision of this Agreement, (iii) each other Person who at any time acquires any High Vote Stock in a transaction or a chain of transactions initiated by another member of the Malone Group, other than Exempt Transfers (except those described in clauses (ii), (vii) or (viii) of the definition of "Exempt Transfer" in Section 1.1 hereof) and (iv) each spouse or other Related Party of any member of the Malone Group, in each case so long as such Person is or is required to be a party to this Agreement or such Person or any of its Related Parties is the direct or indirect Beneficial Owner of any High Vote Stock."  Call Agreement § 1.1.
[27] Compl. ¶ 55.
[28] *Id.* ¶ 56.
[29] *Id.* ¶ 57.

shares of common stock, rather than cash.[30]  The Board then formed an independent committee (the "Independent Committee") comprised of Defendants Dias, Wong, Barton, Gilchrist, David E. Rapley,[31] Romrell, and Vadon.[32]  Following the Board meeting, the Independent Committee met to consider whether the Offer constituted a Bona Fide Offer under the Call Agreement.[33]  The Independent Committee then delegated authority to examine the ramifications of the Call Right's exercise on Maffei's employment and compensation to a compensation committee composed of Wong, Vadon, and Romrell (the "Compensation Committee").[34]

The following day, the Compensation Committee met with financial advisors and outside counsel to discuss its concerns that the Company, by exercising the Call Right, would effectively be allowing Maffei to trigger certain change-in-control provisions in his own contracts, giving rise to substantial severance payments.[35] Following multiple rounds of negotiation, the Compensation Committee eventually authorized a deal with Maffei.[36]

---

[30] *Id.*
[31] Mr. Rapley resigned from the Company's board prior to the filing of the Complaint.  *Id.* ¶ 33.
[32] *Id.* ¶ 59.
[33] *Id.* ¶ 61.
[34] *Id.* ¶¶ 64-65.
[35] *Id.* ¶ 65.
[36] *Id.* ¶¶ 65-75.

7

### 1. The Series of Transactions

On June 2, 2021, the Company notified Malone that it would be exercising the Call Right, payable in common stock.[37] The Company entered into a stock exchange agreement with the Malone Group, under which the latter transferred the former 27,655,931 shares of High Vote Stock in exchange for 30,421,522 shares of common stock, reflecting the 10% maximum premium under the Additional Covenants.[38] This purported exercise of the Call Right constituted a change of control sufficient for Maffei to resign with "Good Reason[,]" which would have triggered the accelerated vesting of Maffei's outstanding and unvested equity awards, along with other severance and penalties payable by the Company.[39]

To avert this, the Company, Maffei, and Liberty Media Corporation—another Malone affiliate where Maffei was also employed—entered into an agreement under which Maffei waived his right to resign for "Good Reason"[40] and gave up two stock option grants that were allegedly underwater, in exchange receiving refreshed restricted share awards of High Vote Stock and confirmation that certain future contemplated equity awards would be issued in High Vote Stock.[41]

---

[37] *Id.* ¶ 80.
[38] *Id.* ¶ 81.
[39] *Id.* ¶¶ 82-83. For clarity's sake, I have simplified the chain of contractual provisions involved.
[40] This would have triggered the accelerated vesting of Maffei's outstanding and unvested equity awards, along other severance and penalties payable by the Company. *Id.* ¶ 83.
[41] *Id.* ¶¶ 84-88.

8

Maffei and the Company also entered into a stock exchange agreement under which (i) Maffei exchanged 5,378,308 shares of common stock for an equivalent award of High Vote Stock; (ii) the Company granted Maffei the right to exchange subsequent awards of restricted stock units from common to High Vote Stock; (iii) Maffei agreed that, until December 31, 2024, he and his controlled affiliates would not exceed 20% of the Company's voting power.[42]

*C. Procedural History*

Plaintiffs filed their Complaint on December 28, 2021.[43] Defendants filed their motions to dismiss on March 15 and 16, 2022.[44] Following briefing, I heard oral argument on those combined motions on April 12, 2023.[45] That same day, I issued a letter opinion granting Evan and George's motion to dismiss under Rule 12(b)(6).[46] This decision resolves the remaining motions.

## II. ANALYSIS

Plaintiffs allege that Malone and Maffei colluded to create a phony offer to trigger the Call Agreement's Acceleration Provision.[47] Malone and Maffei then

---

[42] *Id.* ¶ 86.

[43] *See* Compl.

[44] Def. John. C. Malone's Mot. to Dismiss the Verified S'holder Derivative Compl., Dkt. No. 17; Independent Committee Directors' Mot. to Dismiss the Compl., Dkt. No. 18; Def. Gregory B. Maffei's Mot. to Dismiss Pls.' Verified S'holder Derivative Compl., Dkt. No. 19; Defs. Michael A. George and Evan D. Malone's Mot. to Dismiss Pls.' Verif. S'holder Derivative Compl. and Joinder, Dkt. No. 22.

[45] Tr. of 4-12-2023 Oral Arg. on Defs.' Mot. to Dismiss, Dkt. No. 47.

[46] Letter Decision Regarding Defs. Evan D. Malone and Michael A. George's Mot. to Dismiss, Dkt. No. 45.

[47] Compl. ¶¶ 3-7.

purportedly used their collective control over the Board to ensure that the Call Right was exercised, despite the applicability issues raised by Maffei's affiliation with Malone.[48] The exercise of the Call Right then triggered a Rube Goldbergian system of transactions and agreements that Plaintiffs claim delivered a non-ratable benefit to both controllers.[49] Accordingly, Plaintiffs bring derivative claims for breach of fiduciary duty, against all Defendants, and unjust enrichment, against Malone and Maffei.[50]

## A. Demand Futility

Our state's corporation law vests default decision-making authority in the board of directors.[51] This authority "extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."[52] Therefore, "[i]n order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile."[53]

---

[48] *Id.* ¶¶ 6-9.
[49] *Id.* ¶¶ 10-16.
[50] *Id.* ¶¶ 128-38.
[51] *See, e.g.,* 8 *Del. C.* § 141(a) (stating that the business affairs of every corporation "shall be managed by or under the direction of a board of directors").
[52] *United Food & Commercial Workers Union & Participating Food Indus. Employers Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. Sept. 23, 2021) (citation omitted).
[53] *Id.* (internal quotations and citation omitted).

10

Because both claims in this action are asserted derivatively on behalf of the Company, and no demand was made on the Board, Plaintiffs must first overcome the hurdle of showing demand futility before I reach the merits of the case.

### 1. Standard of Review

Where, as here, the plaintiff in a derivative action did not make a pre-suit demand, she "must meet heightened pleading requirements, alleging particularized factual statements that are essential to the claim."[54] "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[55]

In practice, a plaintiff must plead with particularity that at least half of the board could not impartially consider a litigation demand.[56] The Court assesses impartiality on a director-by-director basis by asking:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a

---

[54] *In re Carvana Co. Stockholders Litig.*, 2022 WL 2352457, at *6 (Del. Ch. June 30, 2022) (internal quotations omitted).
[55] *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000)).
[56] *Id.* at *7.

11

substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[57]

Accordingly, to overcome demand futility the Plaintiffs must allege facts from which I can find or reasonably infer that at least five members of the Board were not independent or disinterested.

### 2. Malone, Maffei, and Evan

The central premise of the Complaint is that Malone and Maffei engaged in a self-dealing transaction from which they derived a non-ratable benefit, to the company's detriment. For the purposes of the motion to dismiss, Defendants do not address Malone and Maffei's interestedness under Rule 23.1.[58] Accordingly, I find that Malone and Maffei were interested in the transaction at issue and could not impartially assess a litigation demand.[59]

Defendant Evan Malone is John Malone's son.[60] Defendants also do not contest Evan's independence from Malone and Maffei for the limited purposes of the motion to dismiss.[61] I therefore find that he was not independent for the purposes of assessing a hypothetical demand.

---

[57] *Id.* (citing *Zuckerberg*, 262 A.3d at 1059).

[58] Independent Committee Directors' Opening Br. in Supp. of their Mot. to Dismiss the Compl. (the "IC Directors OB") 21 n.74, Dkt. No. 18.

[59] *See Cumming v. Edens*, 2018 WL 992877, at *12 (Del. Ch. Feb. 20, 2018) (holding that the court will deem a director who stands on both sides of a transaction interested); *Calma v. Templeton*, 114 A.3d 563, 576 (Del. Ch. 2015); *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014).

[60] Compl. ¶ 41.

[61] IC Directors OB at 21 n.76.

Having established that these three directors were not disinterested or independent, Plaintiffs must now show that at least two additional directors were unable to impartially consider a litigation demand. Plaintiffs do not argue that any of the remaining seven directors received a material benefit from the contested transactions, nor do Plaintiffs explicitly argue that they face a substantial likelihood of liability on the claims at issue here.[62] Accordingly, I focus my remaining demand futility analysis on the question of whether a given director was independent of Malone and Maffei.

### 3. Dias, Gilchrist, and Wong

"[D]irectors are entitled to a presumption that they were faithful to their fiduciary duties[,]" which extends to the independent and disinterested evaluation of litigation demands.[63] Plaintiffs field no particularized allegations challenging the independence and disinterestedness of Defendants Fiona P. Dias, M. Ian G. Gilchrist, and Andrea L. Wong. Indeed, outside of their one sentence introductions in the Complaint's "Parties" section,[64] none of these directors is ever discussed individually.[65] Accordingly, I find that Plaintiffs fail to carry their burden regarding these three directors.

---

[62] In any event, I determine, *infra*, that the Complaint fails to state a claim against these Defendant directors.

[63] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004) (emphasis omitted).

[64] Compl. ¶¶ 26, 28, 32.

[65] *See, e.g., id.* ¶ 59 (including Dias, Gilchrist, and Wong among a list of directors).

Of the four remaining directors, Plaintiffs must show that at least two were not independent of Malone and Maffei.

### 4. Vadon

Plaintiffs allege that Defendant Mark Vadon is not independent because "he enjoys generational wealth due in part to Malone."[66] Vadon had co-founded and been a director of Zulily, Inc., which the Company acquired in 2015, netting Vadon hundreds of millions of dollars.[67] Plaintiffs make no allegations that would support an inference that this transaction was anything but arms-length. This Court has consistently rejected the idea that "naked assertion[s] of a previous business relationship" suffice to impugn a director's independence for the purposes of Rule 23.1.[68] Tellingly, Plaintiffs fail to respond to the arguments in favor of Vadon's independence raised in Defendants' opening brief, waiving the issue.[69] I therefore find that Vadon was independent of Malone and Maffei for the purposes of Rule 23.1.

---

[66] Compl. ¶ 127.
[67] *Id.*
[68] *Owens on Behalf of Esperion Therapeutics, Inc. v. Mayleben*, 2020 WL 748023, at *11 (Del. Ch. Feb. 13, 2020), *aff'd sub nom. Owens v. Mayleben*, 241 A.3d 218 (Del. 2020); *Khanna v. McMinn*, 2006 WL 1388744, at *20 (Del. Ch. May 9, 2006); *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002).
[69] *See* IC Directors OB at 24; Pls.' Answering Br. in Opp. to Defs.' Mots. To Dismiss the Verified S'Holder Derivative Compl. (the "PL Combined AB") 15-30, Dkt. No. 31; *Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived") (citation omitted).

14

5. Barton

Plaintiffs challenge Defendant Richard N. Barton's independence on two grounds: Malone's role in Barton's "generational wealth" and Barton's relationship with Maffei. Per Plaintiffs, "Malone is a primary reason why Barton enjoys generational wealth."[70] "Barton is the founder of Expedia and served as its President and CEO" until it was acquired in 2003 by a Malone-affiliated entity.[71] Maffei served on the board of Expedia at the time of the merger.[72] However, Plaintiffs allege no facts from which I can reasonably infer that this *20-year-old* transaction was anything but arms-length or created in Barton some sense of obligation sufficient to neutralize his independence. Plaintiffs' "generational wealth" argument, as applied to Barton, therefore fails for the same reasons it did for Vadon.

Plaintiffs next argue that Barton is not independent of Maffei because of their longstanding professional connections. The two served together on the boards of Expedia and Liberty Ventures Group LLC and Maffei has served on the board of Zillow, Inc., where Barton is CEO, since 2005.[73] As a threshold matter, I find that, despite Barton and Maffei's longstanding professional relationship, Plaintiffs have

---

[70] Compl. ¶ 122.

[71] *Id.*

[72] *Id.*

[73] *Id*. ¶ 122-24. Plaintiffs also allege that "Barton and Maffei both have relationships with [Technology Crossover Ventures] and [Jay C.] Hoag[.]" *Id.* However, the Complaint lacks any explanation of how this allegation fits into a relationship sufficiently meaningful to impugn a director's presumed independence. I decline to address it further.

15

pled no facts from which I can infer a close personal relationship sufficient to impugn Barton's independence. I therefore focus my analysis on whether there is reason to believe that Barton was controlled or beholden to Maffei because of their professional relationship.

Plaintiffs argue that because, "across Expedia and Zillow, Maffei has been charged with overseeing Barton's work as CEO for over 20 years[,]" Barton could not "impartially consider a demand in which Maffei is personally interested."[74] However, Plaintiffs again fail to connect fact and conclusion. A longstanding professional relationship does not, absent more, give rise to an inference that a corporate fiduciary would willfully breach his duties.[75] Plaintiffs do not argue that serving as Zillow's CEO is material to Barton for either personal or financial reasons; more to the point, they fail to allege that Maffei had the power to interfere with this role by removing Barton or adjusting his compensation.[76] Plaintiffs therefore fail to allege any lack of independence stemming from Barton and Maffei's professional relationships at Zillow and Expedia.

Finally, Plaintiffs argue that Barton is not independent because both he and Maffei are named as defendants in pending federal derivative litigation concerning

---

[74] PL Combined AB at 27 (quoting Compl. ¶¶ 122-23, emphasis omitted).

[75] Indeed, the case that Plaintiffs cite for this proposition, *In re BGC Partners, Inc.*, found a reasonable doubt as to a director's independence based on a *combined* professional and *personal* relationship. 2019 WL 4745121, at *11 (Del. Ch. Sept. 30, 2019) ("*BGC Partners*").

[76] *See* PL Combined AB at 28 (explicitly disclaiming these arguments).

16

Zillow.[77] Plaintiffs allege that "both [Barton and Maffei] face a substantial risk of liability" in that suit and "[c]ommon sense dictates that co-defendants are unlikely to rock the boat."[78] Plaintiffs provide no evidence to support their claim of a "substantial risk of liability[,]" nor do they explain why "common sense dictates" that that a director should commit additional litigation-inducing breaches of fiduciary duty, simply to appease a co-defendant in an unrelated suit.

For the foregoing reasons, Plaintiffs have not pled facts from which I can reasonably infer a relationship between Barton and Maffei sufficient to impugn Barton's independence.

### 6. George

Plaintiffs argue that a demand on Defendant Michael A. George is excused because, in addition to serving on the Board with Malone and Maffei since September 2011, George has been employed at the Company or its affiliates since November 2005.[79] Having stepped down as the Company's CEO in October 2021,[80] George agreed to stay on as a Senior Advisor through December 31, 2021.[81] Plaintiffs allege that, while working at the Company and its subsidiary from 2011 to 2020, George received total compensation in excess of $100 million.[82]

---

[77] *Id.* at 29.
[78] *Id.* at 30.
[79] Compl. ¶ 125.
[80] *Id.*
[81] PL Combined AB at 25.
[82] Compl. ¶ 125.

17

Delaware Courts frequently find a lack of independence where one party has the unilateral power to take away a benefit another party considers material.[83] "As a general matter, compensation from one's principal employment is 'typically of great consequence' to the employee."[84] Here, Plaintiffs allege that Malone and Maffei had sufficient control over the Company to threaten George's employment, implying a lack of independence.[85] Normally, my analysis could end here. Nonetheless, Defendants argue that George's planned retirement just three days after the filing of the Complaint moots any argument that the position or compensation was material.[86] However, looking at George's longstanding professional relationships with Malone and Maffei, in which he frequently reported directly to one or both men in his capacity as an employee, together with the substantial compensation he enjoyed during that same period, I find that Plaintiffs have alleged a sufficient "constellation of facts that, taken together, create a reasonable doubt about [George's] ability to objectively consider a demand."[87]

---

[83] *See, e.g., Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002) (finding that a director may be deemed "controlled" where the controller has the unilateral power to take away a benefit).

[84] *In re Limited, Inc.*, 2002 WL 537692, at *5 (Del. Ch. Mar. 27, 2002)

[85] PL Combined AB at 23-24.

[86] Independent Committee Directors' Reply Br. in Supp. of their Mot. to Dismiss the Compl. (the "IC Directors RB") 8-9, Dkt. No. 36.

[87] *BGC Partners*, 2019 WL 4745121, at *9 (Del. Ch. Sept. 30, 2019) (citation and internal quotation omitted). I note that Defendants' argument that George, on the eve of his retirement, could not be swayed by threats, implied or otherwise, to his employment and compensation ignores that consideration of a post-retirement demand would have fallen to George's successor, the new CEO. Tr. of 4-12-2023 Oral Arg. on Defs.' Mots. to Dismiss at 84:18-85:7. That new CEO would presumably be subject to these very threats.

18

### 7. Romrell

Plaintiffs allege that demand on Defendant Larry E. Romrell should be excused because of his nearly 50-year business and personal relationship with Malone.[88] "Romrell joined TCI in 1960 and, when Malone became CEO in 1973, the two started working closely together to help turn around an underperforming TCI."[89] Romrell has served as a director of various Malone-affiliated companies since 2004.[90] While the professional contacts described here are not necessarily sufficient to impugn Romrell's independence on their own, Plaintiffs also allege specific facts indicative of a close personal relationship between Romrell and Malone.

The personal interactions alleged include, but are not limited to, those that follow. On visits to each other's country homes, the two men have purportedly engaged in activities together ranging from grilling steaks, to riding all-terrain vehicles, to castrating calves.[91] In 1998, Romrell and two others joined Malone on a week-long yacht trip where they worked together in shifts to pilot the vessel

---

[88] *See* PL Combined AB 20-23.
[89] Compl. ¶ 107.
[90] *Id.* ¶¶ 108-09.
[91] *Id.* ¶¶ 110-12. The Plaintiffs stress the latter activity without explaining its significance here. Presumably, Romrell and Malone's neutering of bull calves is a significant male bonding experience, for the subjects of this sentence if not for the objects.

through a storm.[92] In 2013, Romrell and his wife joined the Malones on a trip to Greece to celebrate the latter couple's 50th wedding anniversary.[93]

Because Plaintiffs' most recent allegation is from 2017, Defendants characterize the contacts between Malone and Romrell as "dated[.]"[94] However, I find that the particularized facts Plaintiffs have pled, taken in their totality,[95] give rise to a reasonable doubt of Romrell's ability to impartially considered a stockholder's demand that the corporation pursue litigation against Malone. The contacts alleged are not indicative of a passing or casual personal relationship. Repeatedly spending multiple days together on the ocean or in the wilderness, particularly in a small group, is suggestive, to my mind, of a close friendship. That suggestion is bolstered when one of those trips is in celebration of something as closely personal as a golden wedding anniversary. Such personal relationships are rare in a lifetime; under the facts pled here they create a reasonable doubt as to Romrell's ability to bring his business judgment to bear on a demand.

Plaintiffs have therefore successfully pled that a majority of the Board, comprised of Malone, Maffei, Evan, George, and Romrell, was not disinterested or

---

[92] *Id.* ¶ 113.
[93] *Id.* ¶¶ 115-17.
[94] IC Directors RB at 11.
[95] *Delaware Cnty. Employees Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015).

independent for the sake of considering a litigation demand.  Accordingly, I turn now to the merits of Plaintiffs' claims.

### B. Defendants' Motions to Dismiss under Rule 12(b)(6)

The standard of review appropriate at a motion to dismiss under Rule 12(b)(6) is well-established.  Under that rule, a complaint will be dismissed where the plaintiff could not "recover under any reasonably conceivable set of circumstances susceptible of proof based on the facts as pled in the complaint."[96]  "[T]he court must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor."[97]  However, the court need not accept conclusory allegations or inferences that do not "logically flow" from the non-conclusory facts pled.[98]

#### 1. Malone & Maffei

Per Plaintiffs, "[t]his matter arises because Malone and Maffei, who collectively control Qurate, caused the Company to enter into a series of complicated transactions that benefited them personally but were detrimental to the Company."[99] Having cleared the initial hurdle of demand futility, Plaintiffs must next surmount the issue of showing control.

---

[96] *In re Tesla Motors, Inc. Stockholder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018) (internal quotations and citation omitted).
[97] *Id.*
[98] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006); *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).
[99] Compl. ¶ 3 (footnote omitted).

21

### a. Control

Delaware courts "will deem a stockholder a controlling stockholder when the stockholder: (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but 'exercises control over the business affairs of the corporation.'"[100] Plaintiffs allege that, prior to the transactions at issue here, Malone and Maffei "controlled 47.5% of the voting power of outstanding Company stock[.]"[101] Because collusion between Malone and Maffei is one of the central allegations in the Complaint, supported by particularized pleadings about Maffei's history as Malone's righthand man,[102] I find it reasonable at the pleadings stage to assess their combined holdings for the purposes of determining control.[103]

Because Malone and Maffei together own less than 50% of the Company's combined voting power, the operative question is whether they "*exercise control over the business affairs of* [Qurate]."[104] A plaintiff can plead such an exercise in two ways: "(1) that the minority blockholder actually dominated and controlled the corporation, its board or the deciding committee with respect to the challenged

---

[100] *Tesla Motors*, 2018 WL 1560293, at *12 (quoting *Kahn v. Lynch Commc'n Sys.*, 638 A.2d 1110, 1113-14 (Del. 1994) (emphasis in original)).
[101] Compl. ¶ 35.
[102] *Id.* ¶¶ 37-39.
[103] *See Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019) (recognizing that multiple stockholders together can constitute a control group).
[104] *Kahn v. Lynch*, 638 A.2d at 1113-14 (Del. 1994) (emphasis in original).

transaction or (2) that the minority blockholder actually dominated and controlled the majority of the board generally."[105]  Plaintiffs argue that "[t]he facts alleged in Plaintiffs' Complaint give rise to an inference that it is reasonably conceivable that Malone controlled Qurate, generally, and the transactions, specifically[.]"  Because I find it reasonable to infer that Malone and Maffei controlled the specific transactions at issue, I need not reach the question of general control, at least at this pleadings stage.

As an initial matter, I find that Plaintiffs have successfully pled that Malone and Maffei were potential controllers.  The voting block that these two men controlled was significant and likely would have been dispositive in a contested board election.[106]  Indeed, the very existence of the Call Agreement supports an inference that the Company itself recognized the potency of Malone's voting power, such that it spent $150 million in 1998 on the *conditional option* to buy those votes back.  Evaluating the facts pled from the appropriate plaintiff-friendly perspective, I find at the pleading stage that Malone's voting power, combined with his close association with the Company and Maffei's role as its chairman, suggests that

---

[105] *Tesla Motors*, 2018 WL 1560293, at *13.
[106] *See id.* at *14 (acknowledging the significance of influence over contested elections in the controlling stockholder analysis).

Malone's "insistence on a particular policy or result had the potential to sway the business judgment of the directors and the executives of [the Company]."[107]

Having found that Malone and Maffei had the potential to control the Company, I further find that Plaintiffs have pled sufficient facts to support an inference that Malone and Maffei exercised that control. Here, the impetus for the exercise of the Call Right came directly from Malone and Maffei.[108] The two men then failed to wall themselves off from the decision-making process. Plaintiffs allege that Malone and Maffei attended the initial meeting where the Board discussed the Offer, at which Malone expressed his desire to accept and his "preference to settle the Call Right in shares of the [Company's common stock.]"[109] Subsequent negotiations to resolve the downstream impacts of exercising the Call Right on Maffei's employment and compensation provided additional opportunities for the controllers' preferences to "numb the minds or overcome the business judgment of the other directors."[110]

In sum, Malone and Maffei were potential controllers who stood on both sides of a challenged series of transactions and failed to sufficiently distance themselves

---

[107] *In re Oracle Corp. Derivative Litig.*, 2023 WL 3408772, at *20 (Del. Ch. May 12, 2023).
[108] Compl. ¶¶ 54-57.
[109] *Id.* ¶ 57.
[110] *Oracle*, 2023 WL 3408772, at *23 (citation omitted).

from the Board's decision making.  Accordingly, I find it reasonable to conclude, at least at the pleadings stage, that they controlled the transactions in question.

### b. Breach of Fiduciary Duty

It is established law that the stringent standards of entire fairness review apply to a transaction in which a controller, standing on both sides, breaches his duty of loyalty by extracting a benefit not shared by the other stockholders.[111]  Recognizing this, Malone argues that under Delaware law "[a]n individual who owns a contractual right, and who exploits that right—even in a way that forces a reaction by a corporation—is simply exercising his own property rights, not that of others, and is no fiduciary."[112]  However, as Malone acknowledges, this proposition is limited to the exercise of contractual rights "*in the situations specifically contemplated* by those contracts[.]"[113]  I find that Plaintiffs have raised sufficient doubts that the Call Agreement was intended to apply to Maffei's Offer. Additionally, because the subsequent exercise of the Call Right, and the ramifications of Maffei's contracts which resulted, conveyed non-ratable benefits, Plaintiffs' fiduciary duty claims against Malone and Maffei must go forward.

---

[111] *See, e.g., In re Ezcorp Inc. Consulting Agreement Derivative Litig*., 2016 WL 301245, at *15 (Del. Ch. Jan. 25, 2016) (clarifying that entire fairness review applies to transactions involving self-interested controllers outside the squeeze-out merger context).

[112] Def. John C. Malone's Opening Br. in Supp. of his Mot. to Dismiss the Verified S'Holder Derivative Compl. (the "Malone OB") 8 (quoting *Thermopylae Cap. Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016)), Dkt. No. 17.

[113] *Id.* at 8-9 (emphasis added) (quoting *Sirius XM S'holder Litig.*, 2013 WL 5411268, at *9 (Del. Ch. Sept. 27, 2013)).

As a threshold matter, I find Malone's efforts to characterize Plaintiffs' fiduciary duty claims as a mis-pled breach of contract claim are unpersuasive at this pleadings stage. Here, Plaintiffs allege that Malone and Maffei, leveraging their position as controllers, used a contract provision as a pretext to push through a self-dealing transaction not actually contemplated by that contract.[114] As a result, the claim for breach of fiduciary duty is not duplicative of a hypothetical claim for breach of contract,[115] nor is it focused solely on an exercise of contract rights.

Plaintiffs contend that the Call Right itself was not validly triggered. They argue "that Maffei was Malone's Affiliate under the definitions set forth in the Call Agreement."[116] The Acceleration Provision, under which the Company exercised the Call Right, cannot be triggered by an offer from someone who is "an Affiliate of any Member[.]"[117] Malone is explicitly defined as a Member.[118]

I first note that, given the adequate pleading of control and non-ratable benefit, the issue of whether Maffei was a Malone affiliate, and thus whether the Call Right was actually or pretextually triggered, is not determinative here. For completeness' sake, however, I address the issue below. Per the Call Agreement, "'Affiliate'

---

[114] *See* Compl. ¶¶ 1-19.
[115] For example, the hypothetical claim would presumably not apply to Maffei, who was not a party to the Call Agreement.
[116] PL Combined AB at 37.
[117] Call Agreement at § 2.3(b)(i).
[118] Per the Call Agreement, "'Member' means any member of the Malone Group[,]" which is in turn defined to include "each of [John C.] Malone and Leslie [Malone.]" *Id.* § 1.1.

26

means, when used with reference to a specified Person, any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with, such specified Person."[119] The same section further defines "Person" broadly to include both natural persons and entities, while "Control" "means the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise."[120] Therefore, the question of whether Maffei is a Malone Affiliate turns on whether Malone had the power to direct Maffei's actions.

I find that Plaintiffs have pled particularized facts supporting a reasonable inference that Malone is capable of directing Maffei's actions relating to the Offer. Maffei has worked with and for Malone as his "right-hand man" across over a dozen companies.[121] This ongoing relationship has netted Maffei total compensation that is, per Plaintiffs pithy phrase, "roughly equal to the *per annum* GDP of American Samoa[.]"[122] In 2020, Maffei received more than $74 million in compensation from just the three Malone-affiliated companies where he serves as both an employee and a director.[123] In addition to these past and ongoing financial ties, Maffei netted a handsome financial return and voting power increase from the transactions at issue

---

[119] *Id.*
[120] *Id.*
[121] Compl. ¶¶ 1, 37-39.
[122] PL Combined AB at 43 (emphasis omitted); Compl. ¶ 62.
[123] Compl. ¶¶ 37, 62. Indeed, the Company's 2021 proxy disclosed that Maffei is not independent. *Id.* ¶ 102.

27

here, all at a relatively minimal cost.[124]  Accordingly, weighing Maffei's close ties to Malone as well as his specific and general financial interest in effecting the challenged transactions alongside Malone, I find that a pleadings-stage inference of Malone's control of Maffei in the context of the Call Agreement is reasonable, and, thus, I may infer that Maffei is a contractual Affiliate of Malone.  If so, the "trigger" was never pulled and the need for the company to consider whether to exercise the call was illusory.

### c. Unjust Enrichment

Plaintiffs' cause of action for unjust enrichment appears largely redundant in light of my finding that the claim for breach of fiduciary duty against Malone and Maffei survives.  Here, I note that Defendants' reliance on Malone's contract rights, although insufficient to achieve dismissal of the fiduciary duty claims, remain in the case and may make a claim of unjust enrichment pertinent.  Because the elements of unjust enrichment are met here,[125] I decline to dismiss the claim at the pleading stage.

---

[124] *Id.* ¶¶ 16, 88.  I further find that, viewed in light of the benefits delivered to both Malone and Maffei, Plaintiffs have adequately pled that unfair price.

[125] A cause of action for unjust enrichment requires an enrichment, an impoverishment, a relation between the enrichment and impoverishment, and the absence of justification. *See Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022).  Here, these elements are met by Maffei and Malone's purported abuse of the call right to extract non-pro rata benefits.

## 2. The Independent Committee

Last, I turn to Plaintiffs' claims that the members of the Independent Committee (the "IC Directors")[126] breached their duty of loyalty by approving the challenged transactions.[127]  In order to survive a given director defendant's motion to dismiss, Plaintiffs must plead facts supporting a rational inference that: "the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith."[128]  Plaintiffs take the second path.[129]  This requires Plaintiffs to show that each IC Director, individually, was not independent *and* actively advanced the interests of Malone and Maffei.[130]  Failure to fulfill *either* of these requirements results in dismissal under the second prong of *Cornerstone* with respect to that director.[131]

### a. Barton, Dias, Gilchrist, Rapley, Vadon, and Wong

For the reasons discussed in Section II.A.3, Plaintiffs have not impugned the independence of Dias, Gilchrist, and Wong.  Plaintiffs' allegations against David E.

---

[126] Comprised of Defendants Barton, Dias, Gilchrist, Romrell, Vadon, Rapley, and Wong.
[127] Compl. ¶ 131.
[128] *Cornerstone*, 115 A.3d at 1179-80.
[129] Plaintiffs explicitly disclaim arguments based on the IC Director's self-interest.  PL Combined AB at 56.  Their arguments of bad faith are purely conclusory, to the extent they are made at all. *Id.* at 54-55.  I therefore need not address them further.
[130] *BCG Partners*, 2021 WL 4271788, at *10.
[131] *Id.*

29

Rapley are similarly sparse.[132] While the allegations against Vadon and Barton were less tenuous, I nonetheless found them insufficient to establish a lack of independence, even at the pleadings stage.[133] Accordingly, I grant these six directors' motions to dismiss.

### b. Romrell

The only IC Director whose independence Plaintiffs credibly challenged is Romrell. However, "[e]ven if a director is found to lack independence for purposes of evaluating a demand to sue an interested party, the court must also consider whether she acted to advance the self-interest of the same interested party."[134] This Court has previously recognized that directors are likely to have a harder time deciding to let a suit on behalf of the corporation proceed against a fellow director than they would denying that same fellow director approval of a self-interested transaction.[135] It follows that "[a] director's objectivity concerning a hypothetical demand could be compromised even if her actions in evaluating a transaction were beyond reproach."[136]

---

[132] Rapley was not discussed in Section II.A because he resigned prior to the filing of the Complaint. Compl. ¶ 33. As with Dias, Gilchrist, and Wong, Rapley is never mentioned individually after his introduction in the Complaint's "Parties" section.
[133] *See* Section II.A.4-5.
[134] *In re BGC Partners, Inc. Derivative Litig.*, 2021 WL 4271788 at *10 (Del. Ch. Sept. 20, 2021) *BGC Partners*, 2021 WL 4271788, at *10 ("*BGC Partners II*").
[135] *Id.* at *11.
[136] *Id.*

Plaintiffs argue that Romrell worked to advance the interests of Malone and Maffei by (1) "deem[ing] the Offer a Bona Fide Offer without bothering to consider whether Maffei was an Affiliate of Malone"[137] and (2) that, as part of the Compensation Committee, Romrell breached his duty of loyalty by adopting a proposal put forward by management.[138]

Plaintiffs have pled particularized facts sufficient to support a reasonable inference that Romrell could not impartially consider a hypothetical litigation demand concerning Malone.[139] However, such a finding does relieve Plaintiffs of their burden to plead a duty of loyalty claim against Romrell sufficient to rebut the underlying presumption that "independent directors are presumed to be motivated to do their duty with fidelity."[140] When it comes to the activities of the Independent Committee, the body alleged to have opted to exercise the Call Right, Plaintiffs make no particularized pleadings as to Romrell's role. "[Romrell] was not the Chair of the [Independent] Committee, is not alleged to have engaged in separate discussions with [Malone and Maffei], and did not take a particularly active role in negotiations."[141] Instead, Plaintiffs attempt to coax out an inference of disloyalty

---

[137] PL Combined AB at 54.

[138] *Id.* at 55.

[139] *See* Section II.A.7.

[140] *Cornerstone*, 115 A.3d at 1183 (citation omitted); *see BGC Partners II*, 2021 WL 4271788, at *12.

[141] *BGC Partners II*, 2021 WL 4271788, at *12 (dismissing plaintiffs' claims against a director whose impartiality had been found compromised for demand futility purposes).

31

based on group pleading against the Independent Committee as a whole.[142] This tactic fails as a matter of law.[143]

Plaintiffs' claims that Romrell breached his duty of loyalty as chair of the Compensation Committee fare no better. However, even assuming that Romrell, due to his connections to Malone, was not independent of Maffei, Plaintiffs conclusory allegations fail to state a breach of the duty of loyalty. Once again engaging in group pleading, Plaintiffs argue that the Compensation Committee breached its duty of loyalty by "simply accept[ing] the terms dictated by 'management', who were presumably all in a reporting relationship with Maffei and/or Malone."[144] Here, the Compensation Committee, following multiple rounds of negotiations with Maffei, ultimately adopted a deal structure allegedly proposed by management.[145] Plaintiffs attempt to take Maffei's ultimate acceptance of this deal as evidence that a servile Compensation Committee merely rubberstamped an unreasonably favorable transaction drawn up by Maffei's management minions.[146] Plaintiffs' inference is unreasonable given the facts. A simpler explanation of the same facts pled, consistent with Delaware courts' presumption of independent

---

[142] *See* PL Combined AB at 53-57 (failing to mention a single director, other than Malone and Maffei, by name).

[143] *See In re Tangoe, Inc. Stockholders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018) (holding that a "plaintiff must well-plead a loyalty breach against each individual director; so-called 'group pleading' will not suffice").

[144] PL Combined AB at 55.

[145] Compl. ¶¶ 65-75.

[146] PL Combined AB at 54-55.

directors' fidelity to their fiduciary duties, is that the Compensation Committee adopted the deal after reviewing its structure and finding it to be in the Company's best interests, given the options that would remain after the Company elected to exercise the Call Right. Accordingly, Plaintiffs fail to plead a non-exculpated breach of fiduciary duty against Romrell.

## III. CONCLUSION

For the foregoing reasons, the Independent Committee directors' motions to dismiss under Rule 12(b)(6) are GRANTED. All other outstanding motions under Rules 12(b)(6) and 23.1 are DENIED. The parties should submit a form of order consistent with this decision.